37 F.3d 1155
 65 Fair Empl.Prac.Cas. (BNA) 1757, 63 USLW 2223
 Russell AIKEN, et al. (92-6154); William Ashton, et al.
(92-6159), Plaintiffs-Appellants,
v.
The CITY OF MEMPHIS; Richard C. Hackett, individually and
in his official capacity as Mayor; James Ivy, individually
and in his official capacity as Director of Police Services,
Defendants-Appellees.
Freddie EASON (92-6157), Plaintiff-Appellant,
v.
The CITY OF MEMPHIS, Defendant-Appellee.
Sam DAVIS, et al. (92-6158), Plaintiffs-Appellants,
v.
The CITY OF MEMPHIS; Richard C. Hackett, individually and
in his official capacity as Mayor; B.G. Hall,
individually and in his official
capacity as Director of Fire
Services,
Defendants-
Appellees.
 Nos. 92-6154, 92-6157 to 92-6159.
 United States Court of Appeals,
Sixth Circuit.
 Reargued June 15, 1994.
Decided Oct. 6, 1994.
 
 Merritt, Chief Judge, filed concurring opinion.
 Nathaniel R. Jones, Circuit Judge, filed dissenting opinion in which Keith, Boyce F. Martin, Jr., and Daughtrey, Circuit Judges, joined.
 Keith, Circuit Judge, filed dissenting opinion.
 David M. Sullivan (argued and briefed), Memphis, TN, for Russell Aiken, Frank Amato, Charles Barnes, Kennon Carlton, Danny Carter, Tammy Clevenger, J.R. Coatney, Steve Comella, H.J. Essary, Bryant Jennings, Paul Keating, Barry Lane, Russell Lollar, A.E. Locke, Mark McClain, Frank McGowan, Danny O'Connor, Monte Perkins, Allen S. Rawie, Rick Sansom, E. Lawrence Smith, Dana Stine, Robert J. Stone, Jerry Tennyson, James Wiley, Dan Wood, John R. Wright and Joseph Wright in No. 92-6154.
 Thomas Edwards Hansom, Louis Britt (briefed and argued), H. Lynne Smith, Office of the City Atty., Dan M. Norwood, Charles V. Holmes, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for defendants-appellees in No. 92-6154.
 Gregory B. Friel (briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, for amicus curiae U.S. in Nos. 92-6154, 92-6157.
 David M. Sullivan (argued and briefed), Memphis, TN, Freddie Eason in 92-6157.
 Richard B. Fields, H. Lynne Smith, Mark A. Allen, Agee, Allen, Godwin, Morris & Laurenzi, Louis Britt (argued and briefed), Charles V. Holmes, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for defendant-appellee in No. 92-6157.
 David M. Sullivan (argued and briefed), Memphis, TN, for Sam Davis, Allen Roberts, Herbert Chambers, John Distretti, Kenneth Jackson and Billy L. Tuten, in No. 92-6158.
 Richard B. Fields, Mark A. Allen, Agee, Allen, Godwin, Morris & Laurenzi, Louis Britt (argued and briefed), Charles V. Holmes, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for defendants-appellees in No. 92-6158.
 David M. Sullivan (argued and briefed), Memphis, TN, for William Ashton, Don Boyd, Kennon Carlton, Danny Carter, James Coatney, Steve Cole, Stephen Comella, Dan Cook, Ronald Cummings, Thomas Helldorfer, Billy Garrett, Richard Kitchens, George Maxwell, Frank McGowan, Danny O'Connor, Stephen Roberson, Frederick Sansom, Robert Shelton, Thomas Simmons, Dale Simms, Dana Stine, Roy Tidwell, Ronnie Weddle, Reed Westbrook, James Wright, Joseph Wright and Owen Yarbrough, in No. 92-6159.
 Louis Britt (argued), Charles V. Holmes, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for defendants-appellees in No. 92-6159.
 Before: MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, MULBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER and DAUGHTREY, Circuit Judges.
 RALPH B. GUY, Jr., J., delivered the opinion of the court, in which MERRITT, C.J., KENNEDY, MILBURN, DAVID A. NELSON, RYAN, BOGGS, ALAN E. NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., joined. MERRITT, C.J. (pp. 1168-69), also separately concurred. NATHANIEL R. JONES, J. (pp. 1169-79), delivered a dissenting opinion, in which KEITH, BOYCE F. MARTIN Jr., and DAUGHTREY, JJ., joined. KEITH J. (pp. 1179-81), also separately dissented.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Plaintiffs appeal the district court's dismissal, pursuant to Fed.R.Civ.P. 56, of their "reverse discrimination" civil rights actions. Although we find that the race-based promotions at issue here were supported by a "compelling interest," we conclude that a genuine issue remains as to whether the promotions were made pursuant to a "narrowly tailored" remedy. We therefore vacate the summary judgments for defendants and remand these cases to the district court.
 
 I.
 A.
 
 2
 In 1974, the United States Department of Justice brought a civil rights action against the City of Memphis, Tennessee, in which it alleged that the City had engaged in race and gender discrimination in the hiring and promotion of City employees. To settle this lawsuit, the City and the United States entered into a consent decree that was approved by the United States District Court for the Western District of Tennessee in November 1974. In the decree, the City denied that it had unlawfully discriminated but admitted that certain of its past practices may have given rise to an inference that it had engaged in unlawful discrimination. The decree stated that its purpose was "to insure that blacks and women are not placed at a disadvantage by the hiring, promotion and transfer policies of the City, and that any disadvantage to blacks and women which may have resulted from past discrimination is remedied so that equal employment opportunities will be provided to all." (Eason App. at 19.) Moreover, the decree provided:
 
 
 3
 [I]n determining whether th[is] purpose has been achieved, an appropriate standard of comparison is the proportion of blacks and women in the Shelby County civilian labor force. The City, therefore, agrees to undertake as its long term goal in this decree, subject to the availability of qualified applicants, the goal of achieving throughout the work force proportions of black and female employees in each job classification, approximating their respective proportions in the civilian labor force.
 
 
 4
 (Eason App. at 19-20.) The decree further stated that the City could apply for dissolution of the decree at any time after five years subsequent to the date of its entry.
 
 
 5
 The City was sued again when, in August 1975, the Afro-American Police Association filed in the same district court an action in which it alleged that the promotion practices of the Memphis Police Department were racially discriminatory. To settle this action, the parties entered into a consent decree that was approved by the district court in March 1979. In the stipulation of facts that was submitted along with the decree, the City denied that it had "intentionally engaged in unlawful employment discrimination with respect to the employment of blacks on the Memphis Police Department in the period since March 24, 1972," but admitted that "historically blacks have been excluded from or limited in hiring or promotional opportunities within its police department[.]" (Aiken Plaintiffs' Brief Addendum at 22.) The decree declared that its purpose was "to prohibit unlawful discrimination in the promotional practices of the Memphis Police Department, and to eliminate any effects of prior discrimination." (Aiken App. at 164.) The decree thus provided that, "to the extent that qualified black applicants are available ... the percentage of promotions awarded to blacks at each rank shall constitute at least the percentage which blacks constitute in the next rank below." (Aiken App. at 164.)
 
 
 6
 In 1977, the City was sued once again. Carl Stotts, a black employee of the Memphis Fire Department, filed in the same district court an action in which he alleged that the fire department had racially discriminated in its hiring and promotion practices. The Stotts litigation thereafter was certified as a class action and consolidated with another lawsuit filed by a different black employee of the Memphis Fire Department. In 1980, the parties to the Stotts litigation entered into, and the district court approved, a consent decree whose purpose was "to remedy the past hiring and promotion practices of the Memphis Fire Department with respect to the employment of blacks and [to continue] the efforts made in the City in hiring and promotions under the [1974] consent decree[.]" (Eason App. at 63.) The 1980 decree shared with the 1974 decree the goal of "rais[ing] the black representation in each job classification on the fire department to levels approximating the black proportion of the civilian labor force in Shelby County." (Eason App. at 63.) The City accordingly "adopt[ed] the goal of promoting Black applicants to positions above the rank of private or other entry level job classification in proportion to their representation in the qualified applicant pool for each uniformed rank or civil service classification." (Eason App. at 64.) The parties to the 1980 decree further agreed that, without regard to the actual percentage of blacks in the lower ranks of the fire department, at least 20% of each year's promotions would be reserved for blacks. The 1980 decree cautioned, however, that it should not "be construed in such a way to require the promotion [of] the unqualified or the promotion of the less-qualified over the more qualified as determined by standards shown to be valid and non-discriminatory[.]" (Eason App. at 64.)
 
 
 7
 In 1981, the City and the United States entered into an "amended consent decree," in which they agreed that "certain provisions of the [1974] decree have served their purpose, and the goals of [that] decree should be updated to meet present circumstances." (Eason App. at 77.) The 1981 decree "substitute[d] for the [1974] decree" (Eason App. at 77) and was approved by the district court. The 1981 decree reaffirmed the 1974 decree's long-term goal of remedying any disadvantage to blacks that may have resulted from past discrimination, and retained, subject to the availability of qualified applicants, "the goal of achieving in the Divisions, and where applicable, the job categories and classifications specified in this decree[,] proportions of black and female employees approximating their respective proportions in the relevant Shelby County civilian labor force." (Eason App. at 79.) The 1981 decree also provided:
 
 
 8
 Promotional vacancies within the uniformed rank structure of the Police and Fire Divisions shall be filled in accordance respectively with the terms of the consent orders entered on March 20, 1979, in Afro-American Police Ass'n v. City of Memphis ... and on April 21, 1980 in Stotts v. City of Memphis ....
 
 
 9
 (Eason App. at 80.) Like the 1980 decree, however, the 1981 decree stated that it was not "intended to require the City to hire unnecessary or unqualified personnel, or to hire, transfer or promote a less qualified person in preference to a better qualified person[.]" (Eason App. at 79.) The 1981 decree further provided that the City could move for its dissolution at any time after March 1, 1984, but the City has yet to do so.
 
 B.
 
 10
 The Aiken litigation concerns Memphis Police Department promotions to the rank of sergeant during the years 1988 and 1989. The Eason litigation concerns Memphis Fire Department promotions to the positions of lieutenant, investigator, and battalion commander during the same years. The promotion process for all of these positions consists of four components: (1) a written examination; (2) an evaluation of the employee's performance record; (3) seniority points; and (4) an oral interview. After completing this process, each candidate for promotion is assigned a numerical score and placed in rank order.
 
 1.
 
 11
 In 1988, the Memphis Police Department made 75 promotions to the rank of sergeant, for which 210 officers competed. After the promotion candidates were placed in rank order, it was discovered that, while 32.4% of the officers in the rank below sergeant (which is patrol officer) were black, only 9.3%, or 7, of the top 75 candidates were black. To meet the consent decrees' goal of proportionate black promotions, the City promoted not only the 7 blacks among the 75 top-ranked candidates, but also 19 other blacks who were were ranked below the 75th position.
 
 
 12
 Similarly, in 1989, the police department made 94 promotions to the rank of sergeant, for which 177 officers competed. Since only 16%, or 15, of the 94 top-ranked candidates were black, the City promoted, in addition to these 15 candidates, 18 other black candidates who were ranked below the 94th position.
 
 
 13
 The Aiken plaintiffs are white officers in the Memphis Police Department who were denied promotions to sergeant in 1988 and/or 1989, despite having been ranked higher than most of the black candidates who were promoted to sergeant. The Aiken plaintiffs sued the City of Memphis, and both the Memphis Mayor and Director of Police Services in their official and personal capacities. In their complaints,[1] the Aiken plaintiffs alleged violations of their rights under, inter alia, the Equal Protection Clause, and additionally sought to enforce their understanding of the terms of the consent decrees. Defendants thereafter moved for summary judgment. In a brief order, the district court held that the Aiken plaintiffs lacked standing to enforce the decrees and that their equal protection claims were without merit. The court therefore granted defendants' motion and closed the cases. The Aiken appeal followed.
 
 2.
 
 14
 The Memphis Fire Department made 50 promotions to the rank of lieutenant in 1988-89, for which 81 fire privates and fire drivers competed. Since only 15.3% of the department's fire privates and fire drivers were black, the City adopted the 20% minimum black promotion goal set forth in the 1980 decree. Of the 50 top-ranked candidates, two were black. The City promoted these two candidates as well as nine other black candidates who were ranked below the 50th position.
 
 
 15
 The fire department made two promotions to the rank of investigator in 1989, for which 12 employees competed. Although blacks constituted 34.3% of the employees in the rank below investigator and three blacks were among those competing for the two promotions, neither of the two top-ranked candidates were black. To satisfy the terms of the 1980 and 1981 consent decrees, however, the City promoted a black candidate who was ranked below the 2nd position.
 
 
 16
 In 1988-89, the fire department also made 13 promotions to the position of battalion commander, for which 35 employees competed. Blacks constituted 20% of the employees in the rank below battalion commander, but only one of the 13 top-ranked candidates was black. The City promoted this candidate in addition to three other black candidates who were ranked below the 13th position.
 
 
 17
 The Eason plaintiffs are white employees of the Memphis Fire Department who unsuccessfully competed for the promotions described above. Each of these plaintiffs were ranked higher than most black candidates who received a promotion. Like the Aiken plaintiffs, the Eason plaintiffs sued the City of Memphis, and both the Memphis Mayor and Director of Fire Services in their official and personal capacities. Similarly, in their complaints,[2] the Eason plaintiffs alleged violations of their rights under, inter alia, the Equal Protection Clause, and additionally sought to enforce their understanding of the consent decrees. The City thereafter moved for summary judgment. In another brief order, the district court held that the Eason plaintiffs lacked standing to enforce the decrees and that their equal protection claims were without merit. The district court accordingly granted the City's motion and closed the cases. The Eason appeal followed.
 
 II.
 
 18
 We review de novo the district court's grants of summary judgment. McKee v. Cutter Labs., Inc., 866 F.2d 219, 220 (6th Cir.1989). Summary judgment is appropriate when "the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial[.]" Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987). An issue remains for trial if the evidence is such that a jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 19
 On appeal, the Aiken and Eason plaintiffs reiterate their arguments that the City's use of race-based promotion goals violated their rights under the Equal Protection Clause. That Clause guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, Sec. 1. The "central purpose" of the Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." Shaw v. Reno, --- U.S. ----, ----, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993). Accordingly, " '[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees.' " Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273-74, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion) (quoting Fullilove v. Klutznick, 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)). Thus, in Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a majority of the Supreme Court agreed that all governmental classifications by race are subject to "strict scrutiny," regardless of whether they are supported by a "remedial" or "benign" purpose. Id. at 493-94, 109 S.Ct. at 721-22 (plurality opinion); id. at 520, 109 S.Ct. at 735 (Scalia, J., concurring in the judgment).
 
 
 20
 The City nevertheless suggests that we should subject the promotional remedies set forth in the consent decrees to a lesser degree of scrutiny because the decrees have been judicially approved. This suggestion is foreclosed, however, by the unequivocal language of our opinion in United Black Firefighters Ass'n v. City of Akron, 976 F.2d 999 (6th Cir.1992):
 
 
 21
 Croson holds that all racial preferences instituted by a state actor, even those designed to achieve "racial balance" in a state actor's workforce, are subject to strict scrutiny.... Croson simply does not exempt consent decrees from its requirements.
 
 
 22
 Id. at 1008 (emphasis in original).
 
 
 23
 Similarly, the City intimates that, in determining whether the decrees' promotional remedies are constitutional, we should consider ourselves bound to some undefined extent by language contained in our opinion in Stotts v. Memphis Fire Department, 679 F.2d 541 (6th Cir.1982), rev'd sub nom. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). A majority of the Stotts panel stated that the 1980 decree was constitutional. 679 F.2d at 556. For several reasons, however, we do not consider ourselves bound in any way by that statement. First, and most important, the relevant law has changed considerably since our decision in Stotts. There, we merely asked whether the decree was "reasonable." Id. at 558. That standard subsequently was singled out for sharp criticism by the Supreme Court, see Wygant, 476 U.S. at 279, 106 S.Ct. at 1849-50 ("The [Sixth Circuit] examined the means chosen to accomplish the Board's race-conscious purposes under a test of 'reasonableness.' That standard has no support in the decisions of this Court") (plurality opinion), and differs markedly from the strict scrutiny test that we must apply today. Second, there is good reason to doubt that the issue of the constitutionality of the 1980 decree (which was not briefed by the parties in Stotts ) was properly before the Stotts court. See Stotts, 679 F.2d at 570 ("Nor has this Court been presented with the contention that the decree constitutes 'reverse discrimination.' I dissent from Judge Keith's sua sponte conclusion that the decree is 'constitutional.' ") (Martin, J., dissenting). Finally, our decision in Stotts was reversed by the Supreme Court, albeit on other grounds. See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).
 
 
 24
 We therefore conclude that the decrees' promotional remedies are subject to a strict scrutiny analysis. "There are two prongs to this examination. First, any racial classification 'must be justified by a compelling governmental interest.' Second, the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.' " Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion) (citations omitted).
 
 
 25
 When, as here, a race-based affirmative action plan is subjected to strict scrutiny, the party defending the plan bears the burden of producing evidence that the plan is constitutional. The party challenging the plan, however, retains the ultimate burden of proving its unconstitutionality. Brunet v. City of Columbus, 1 F.3d 390, 404-05 (6th Cir.1993), cert. denied sub nom. Brunet v. Tucker, --- U.S. ----, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994). Thus, to have been entitled to summary judgment, the City must have satisfied its burden of production and the Aiken and Eason plaintiffs must not have presented evidence that would allow a reasonable jury to conclude that they satisfied their burden of proof.
 
 
 26
 We first consider whether the race-based promotions at issue here were supported by a compelling interest. In United Black Firefighters, we recognized that "a state actor possesses a compelling state interest when its concern is with remedying past discrimination." 976 F.2d at 1009. But the existence of societal discrimination alone cannot support a racial classification; rather, the Supreme Court "has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). No formal finding of past discrimination by the governmental unit involved is necessary to determine that a compelling interest exists, Brunet, 1 F.3d at 406, but there must be "strong" or "convincing" evidence of past discrimination by that governmental unit. Croson, 488 U.S. at 500, 109 S.Ct. at 725; United Black Firefighters, 976 F.2d at 1010.
 
 
 27
 It is settled that "[a]ppropriate statistical evidence setting forth a prima facie case of discrimination is sufficient to provide a strong basis in evidence to support a public employer['s] affirmative action plan." Brunet, 1 F.3d at 407 (emphasis in original); see also Croson, 488 U.S. at 501, 109 S.Ct. at 725. As we explained in United Black Firefighters, "appropriate" statistical evidence involves an examination of the racial composition of the qualified labor pool:
 
 
 28
 The method generally used is to compare the minority percentage in the relevant statistical pool to the minority percentages in the group of persons selected for the positions at issue. The relevant statistical pool is comprised of all persons qualified for the position at issue. Roughly the same percentage of minorities observed in the relevant statistical pool should also be observed in the group of persons selected for the position at issue. Where a gross disparity exists between the expected percentage of minorities selected and the actual percentage of minorities selected, then prima facie proof exists to demonstrate intentional discrimination in the selection of minorities to those particular positions. Such prima facie proof presents a strong basis in evidence to support a finding of a compelling governmental interest.
 
 
 29
 976 F.2d at 1011 (citations omitted); see also Hazelwood School Dist. v. United States, 433 U.S. 299, 307-09, 97 S.Ct. 2736, 2741-43, 53 L.Ed.2d 768 (1977).
 
 
 30
 In the Aiken litigation, the City presented evidence of a wide disparity between the percentage of black patrol officers and the percentage of black sergeants in the Memphis Police Department during the years 1971-78. In 1971, 11% of the patrol officers were black, but only 5.9% of the sergeants were black. In 1978, 23% of the patrol officers were black, but only 7.5% of the sergeants were black. (Aiken Plaintiffs' Brief Addendum at 23.) Although such a disparity "is not conclusive as to a finding of discrimination," Brunet, 1 F.3d at 407 (emphasis in original), the Aiken plaintiffs have not offered any evidence to rebut the inference of discrimination that arises from these statistics.
 
 
 31
 Similar statistics suggest a pattern of racial discrimination in promotions in the Memphis Fire Department. The most junior firefighter position in the department is that of "fire private." (Eason App. at 64.) In 1979, although 14.3% of the fire privates were black, only 11 of 594, or 1.1%, of the firefighters above that rank were black. Stotts, 679 F.2d at 550 n. 5 (setting forth statistics). The Eason plaintiffs have not offered any evidence to rebut the inference of discrimination that arises from these statistics.
 
 
 32
 The Aiken and Eason plaintiffs argue, however, that these statistics cannot be "strong evidence" of past discrimination because they are not based on the qualified labor pool. Plaintiffs assert that these statistics are based upon an overbroad labor pool, since not all patrol officers and fire privates are qualified for promotion to the next rank. These statistics, however, are far more probative of discrimination than are general work force statistics, which were criticized by the Seventh Circuit in Janowiak v. Corporate City of South Bend, 836 F.2d 1034, 1041-42 (7th Cir.1987), cert. denied, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). Moreover, the compelling interest inquiry focuses simply on whether discrimination occurred, not on the precise extent of any discrimination that did occur. Thus, we conclude that the statistics presented here are probative enough to satisfy the City's burden of producing strong evidence that discrimination occurred in the Memphis Police and Fire Departments. Since, as noted above, plaintiffs have not rebutted the inferences that arise from these statistics, we conclude that no genuine issue remains as to whether the race-based promotions in question were supported by a compelling interest.[3]
 
 
 33
 We next consider whether the race-based promotions at issue here were made pursuant to a narrowly tailored remedy. Because " 'racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification[,]' " a governmental classification based on race "must be specifically and narrowly framed to accomplish" its remedial purpose. Wygant, 476 U.S. at 280, 106 S.Ct. at 1850 (plurality opinion) (quoting Fullilove, 448 U.S. at 537, 100 S.Ct. at 2805 (Stevens, J., dissenting)). To determine whether this demanding standard has been met,
 
 
 34
 we look to several factors, including the necessity for the [race-based] relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.
 
 
 35
 United States v. Paradise, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (plurality opinion); see also id. at 187, 107 S.Ct. at 1074 (Powell, J., concurring).
 
 
 36
 In light of these factors, two aspects of the race-based promotional remedies at issue here are problematic. First, the City has made no effort to limit the duration of these remedies. The 1979 and 1981 decrees provide that the use of validated non-discriminatory promotional procedures may be an acceptable alternative to race-based relief. Indeed, over 15 years ago the City stipulated that it "is currently in the process of developing" such procedures, and that "development of fully validated processes is two to three years from accomplishment." (Aiken Plaintiffs' Brief Addendum at 26.) Yet, incredibly, the City continues to make police and fire department promotions according to procedures that have not been validated as racially neutral. This dereliction cuts against a finding that the race-based remedies at issue here are narrowly tailored, for, as Judge Posner has explained:
 
 
 37
 It should be unnecessary to add that a public employer cannot be allowed to justify reverse discrimination by the bootstrap method of an alternating sequence of racial promotions (or hires). That is, the city cannot get points for first using a presumptively biased eligibility list to make a string of white promotions and then turning around and trying to do some rough racial justice by promoting two blacks from the bottom of the list.
 
 
 38
 Billish v. City of Chicago, 989 F.2d 890, 894 (7th Cir.) (en banc), cert. denied, --- U.S. ----, 114 S.Ct. 290, 126 L.Ed.2d 240 (1993).
 
 
 39
 We note that the City's failure even to develop validated promotional procedures suggests political pressures may have prevented it from utilizing racially neutral remedies as an alternative to the promotion goals set forth in the decrees. When such pressures are present, racially neutral remedies often will remain untried, absent legal action by those persons adversely affected by the race-based relief. Under such circumstances, the courts must take special care as they engage in their "most searching examination" of whether racial preferences have been shown to be necessary, Wygant, 476 U.S. at 273, 106 S.Ct. at 1846, since that examination will not be undertaken by any other body. Otherwise, promotion and hiring goals may come to resemble not remedies but entitlements. That development surely "would not bespeak the kind of sensitivity to the importance of avoiding racial criteria in making employment decisions, whenever it is possible to do so, that Croson requires." Billish, 989 F.2d at 894.
 
 
 40
 Second, the promotion goals set forth in the 1979 and 1980 decrees may not bear a sufficiently precise relationship to the "relevant labor market" to be "narrowly tailored." At the outset, however, we note our disagreement with the Eason plaintiffs' argument that the 20% promotion "floor" in the 1980 consent decree is overbroad because it bears no necessary relationship "to any injury suffered by anyone." (Eason En Banc Brief at 36.) If the 20% floor itself somehow were a long-term goal, plaintiffs might have a point. This floor, however, is merely a means of speedily realizing the long-term goals of the decrees. And the result reached in Paradise makes clear that it is a permissible means of realizing those goals. See 480 U.S. at 179-80, 107 S.Ct. at 1070-71 (50% hiring floor was permissible means of reaching long-term goal of 25% black representation in police force) (plurality opinion); id. at 188, 107 S.Ct. at 1075 (Powell, J., concurring); but see In Re Birmingham Reverse Discrimination Employment Litig., 20 F.3d 1525, 1543 (11th Cir.1994) (50% "quota" was impermissible means of reaching long-term goal of 28% black representation).
 
 
 41
 But, as noted earlier, the 1979 and 1980 decrees provide that, to the extent qualified applicants are available, the percentage of blacks promoted to each rank shall be at least the percentage of blacks in the next rank below. As a result of this "ripple effect," the promotion goals are tied to the hiring goals contained in the 1974 and 1981 decrees. Those hiring goals are determined by reference to the undifferentiated "Shelby County civilian labor force." (Aiken App. at 142).[4] Thus, the promotion goals ultimately are tied to undifferentiated Shelby County labor force statistics. If the percentage of blacks in the Shelby County labor force is greater than the percentage of blacks in the qualified labor pool for the positions of patrol officer and fire private, this reliance upon undifferentiated Shelby County labor force statistics eventually might cause more blacks to be promoted than would have been promoted in a system that never had been influenced by discrimination against blacks. In that event, the promotion goals would move beyond the elimination of the "vestiges of past discrimination," Board of Education of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 245, 111 S.Ct. 630, 635, 112 L.Ed.2d 715 (1991), to engage in unwarranted racial classifications. Cf. Wygant, 476 U.S. at 294, 106 S.Ct. at 1857 ("Because the layoff provision here acts to maintain levels of minority hiring that have no relation to remedying employment discrimination, it cannot be adjudged 'narrowly tailored' to effectuate its asserted remedial purpose.") (O'Connor, J., concurring in the judgment).
 
 
 42
 We therefore must determine if a genuine issue exists as to whether the racial composition of the Shelby County labor force differs materially from that of the qualified labor pool for the positions of patrol officer and fire private. In Croson, the Supreme Court "recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination." 488 U.S. at 501, 109 S.Ct. at 726. The Court reiterated, however, that " '[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.' " Id. (quoting Hazelwood, 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13). "Special qualifications," then, winnow out a large enough portion of the general workforce to create a real possibility that the qualified labor pool for the position will have a materially different racial composition than that of the general workforce.
 
 
 43
 Here, the qualifications for the positions of patrol officer and fire private have this winnowing effect. The qualifications for police officers in Tennessee are set forth in Tenn.Code Ann. Sec. 38-8-106.[5] The qualifications for firefighters in Tennessee are very similar and are set forth in Tenn.Com.R. & Regs. tit. 4, ch. 0360-7-.01.[6] Since the qualifications for these positions winnow out a significant portion of the general workforce, there indeed is a possibility that the racial composition of the qualified labor pools for these positions will materially differ from that of the general Shelby County labor force.[7]
 
 
 44
 Amicus curiae the United States argues, however, that the reasoning of Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), compels us to reach a contrary conclusion. The plaintiff in Dothard claimed that a height and weight requirement disproportionately excluded women from the position of prison guard in the Alabama prison system. The United States maintains that the qualifications for the Alabama prison guard position were, apart from the height and weight requirement, similar to those for the positions of police officer and firefighter in Tennessee. The Dothard Court relied on national height and weight statistics to conclude that the height and weight requirement disproportionately excluded women from the qualified labor pool for the prison guard position.[8] In doing so, the Court implicitly assumed that the height and weight composition of the otherwise-qualified labor pool did not differ from that of Americans generally. The United States suggests that the Court's reliance on general population statistics indicates that the qualifications at issue in Dothard did not winnow out a significant portion of the general population, because, if they did, the otherwise-qualified labor pool for the Alabama prison guard position presumably could have had a different height and weight composition than that of the general population.
 
 
 45
 The United States' argument is flawed in two respects. First, the qualifications for the Alabama prison guard position differed from those at issue here, in that, among other things, a felony conviction did not render one unqualified for the prison guard position. See id. at 327, 97 S.Ct. at 2725 (setting forth qualifications). Second, and more important, race is unlike height and weight for demographic purposes. While the racial compositions of different groups of men and women (such as northern Michigan farmers and Detroit public school teachers) can vary dramatically, there is no reason to believe that the height and weight composition of the national population was any different from that of the otherwise-qualified labor pool for the Alabama prison guard position. Since we must determine whether there is a possibility that the racial composition of two groups--the general Shelby County workforce and the qualified labor pool for the positions of police officer and firefighter--are materially different, the Dothard Court's reliance on general population statistics does not indicate that reliance upon such statistics is proper here. The factual question raised there simply was different in kind from that raised here.
 
 
 46
 We therefore must remand these cases to the district court so that it may reexamine its finding on the narrowly tailored issue. On remand, the court should consider the City's failure to utilize or even develop validated procedures for promotions in the police and fire departments. Additionally, the court should ascertain as best it can the racial makeup of the qualified labor pool for the positions at issue, so that it can determine whether the decrees' hiring and promotion goals have caused black representation in the relevant higher ranks to be greater than that representation would have been if no discrimination had ever occurred.[9]
 
 III.
 
 47
 In addition to attacking the consent decrees on constitutional grounds, the Aiken and Eason plaintiffs each argued below that the decrees have not been applied as written. In support of this argument, plaintiffs maintained that the decrees do not require the City to engage in affirmative action, but only mandate the establishment of racially neutral testing procedures. Plaintiffs now argue that the district court erred when it held that they each lacked standing to present this argument.[10]
 
 
 48
 In Vogel v. City of Cincinnati, 959 F.2d 594, 598 (6th Cir.1992), we held that third parties to a consent decree lack standing to enforce their understanding of its terms. In so holding, we relied on the following language in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975): "[A] well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." Id. at 750, 95 S.Ct. at 1932 (emphasis added). Despite this language, plaintiffs argue that their cases are distinguishable from Vogel because, in plaintiffs' view, they were intended third-party beneficiaries of the consent decrees. This view of the decrees is based on the decrees' declared object of ensuring that "equal employment opportunities will be provided to all." (Eason App. at 19) (emphasis added).
 
 
 49
 We reject plaintiffs' argument. The plain language of Blue Chip indicates that even intended third-party beneficiaries of a consent decree lack standing to enforce its terms. Although other circuits have held to the contrary, see Hook v. Arizona Dep't of Corrections, 972 F.2d 1012, 1015 (9th Cir.1992) (concluding that the holding of Blue Chip "does not apply to intended third party beneficiaries"); Berger v. Heckler, 771 F.2d 1556, 1565 (2d Cir.1985) ("we think that [Blue Chip ] was not intended to preclude nonparties from intervening to enforce a consent decree where otherwise authorized by the federal rules of civil procedure"), we are unable to join them until the Supreme Court revisits the unequivocal language of Blue Chip.
 
 
 50
 The district court's grants of summary judgment are VACATED, and these cases are REMANDED for proceedings consistent with this opinion.[11]
 
 
 51
 MERRITT, Chief Judge, concurring.
 
 
 52
 The plaintiffs, who complain of reverse discrimination by the City of Memphis, argue that the number of blacks in the lowest ranks of the police and fire departments has been artificially inflated. This is because the city administration interprets the consent decree as allowing the hiring of blacks based simply on their greater percentage in the general population of the county rather than on the lesser percentage of blacks in the labor pool who are qualified to be hired as officers. Thus the plaintiffs argue that a promotional ratio based on the percentages in the lowest ranks artificially inflates the number of black officers promoted. They argue that the consent decree is being unconstitutionally enforced and should be modified or terminated.
 
 
 53
 For two reasons there appears to be substance to this argument, and I agree with the court that the case should be remanded to the district court for trial.
 
 
 54
 First, entry level officers must have several special qualifications above the general labor force in Shelby County. For example, an officer must be a high school graduate in order to qualify, and the officer must not have a criminal record. We do not know at the present time how the criminal record statistics would affect the qualified labor pool. But the 1990 census shows that 85% of whites in Shelby County graduated from high school. Only 60% of blacks over 24 years of age are high school graduates and only 68% of blacks between 18 and 24 are high school graduates. Thus there is a substantial difference in the general labor pool and the qualified labor pool for fire and police officers. If the consent decree remains in effect, this difference must be either taken into account in hiring and promotion or a valid reason must be given for discarding it.
 
 
 55
 Second, the general population and the voting population of the City of Memphis is now predominantly black and African-Americans hold the levers of governmental power. The Mayor, the police chief and the majority of high level administrative officials of the city are black. Accordingly, there is a substantially greater risk that the continued use of racial hiring goals which greatly exceed the qualified labor pool in question will discriminate against whites. That is what the plaintiffs claim. We may not assume in such a situation that the required employment ratio is benign. History and common sense tell us that it is possible for blacks to discriminate against whites as well as vice versa. The court has an obligation to ensure that the decree is not being used to prefer the majority race in the city, whether black or white. Hence there must be a factual determination on this issue. Further there remains in this case a threshold question not addressed by the court below: whether neutral and objective employment standards should now be formulated to replace preferential hiring ratios based on color.
 
 
 56
 Because the plaintiffs have proffered substantial evidence that the hiring and promotional percentages now used by city officials give blacks a much greater opportunity for employment, and hence promotion, than the percentage of blacks and whites in the qualified labor pool would justify, I agree with the court that the case should go to trial on the merits and not be disposed of summarily without a trial. Also it seems clear that careful and intensive scrutiny should be required in communities where it is claimed that the race which controls the governmental machinery is placing the minority race at a clear disadvantage in hiring and promotion. It may well be that a trial will show that racially based hiring under the consent decree should now be terminated. The Equal Protection Clause does not allow the majority race in a city to use its governmental power to prefer its race over the minority race except in the most unusual and compelling circumstances. To hold otherwise would be to reinstitute racial discrimination, the constitutional wrong that the parties and the court below were seeking to remedy when the decree was originally entered.
 
 
 57
 NATHANIEL R. JONES, Circuit Judge, dissenting, with whom KEITH, BOYCE F. MARTIN, Jr. and DAUGHTREY, Circuit Judges, join.
 
 
 58
 We respectfully dissent because, contrary to the majority, we believe that the City of Memphis has narrowly tailored the challenged affirmative action plans to achieve a compelling state interest. Furthermore, we are convinced that the majority's application of the strict scrutiny test to reverse the grant of summary judgment to Memphis is a most regrettable and critical error. Finally, we feel compelled to express our conviction that by failing to uphold consent decrees, such as those at issue here, the majority runs afoul of the Fourteenth Amendment and the clearly stated aspirations of the 1991 Civil Rights Act, Pub.L. No. 102-166, 105 Stat. 1071 (codified in scattered sections of 42 U.S.C.).
 
 I.
 
 59
 Strict scrutiny is inappropriately applied to benign racial classifications intended to remedy our nation's deplorable history of racial discrimination. The majority has erroneously read recent Supreme Court cases, which hold that strict scrutiny is appropriately applied in some contexts, as requiring strict scrutiny be applied to all racial classifications. Even after examining the Memphis plans under this most stringent standard of review, we find that the affirmative action plans at issue here satisfy strict scrutiny.
 
 
 60
 Strict scrutiny requires that a state's use of racial classifications must be narrowly tailored to support a compelling government interest. United Black Firefighters Ass'n v. City of Akron, 976 F.2d 999, 1009 (6th Cir.1992) (citing City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505-07, 109 S.Ct. 706, 727-29, 102 L.Ed.2d 854 (1989)). Applying this two-pronged analysis to the case before us, we agree with the majority that "the race-based promotions in question were supported by a compelling interest." Maj. Op. at 1163-64. We must part company with the majority, however, insofar as it concludes that the remedial actions taken by Memphis were not narrowly tailored.
 
 
 61
 In determining whether a remedy is narrowly tailored, the Supreme Court has instructed courts to look at several important criteria, including: (1) the efficacy of alternative remedies; (2) the planned duration of the remedy; (3) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (4) the availability of waiver provisions if the plan cannot be met; and (5) the effect of the remedy upon innocent third parties. United States v. Paradise, 480 U.S. 149, 187, 107 S.Ct. 1053, 1074, 94 L.Ed.2d 203 (1987) (Powell, J., concurring); Davis v. City & County of San Francisco, 890 F.2d 1438, 1447 (9th Cir.1989), cert. denied, 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 206 (1990). Evaluating Memphis' challenged plans in light of these considerations, we conclude that the City's limited use of race-conscious relief was narrowly tailored for several reasons.
 
 
 62
 As an initial matter, the challenged plans do not bar white employees from being promoted. See Paradise, 480 U.S. at 183, 107 S.Ct. at 1072 (quoting Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 282-83, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986)) (finding that "like a hiring goal, [the promotion goal] 'impose[s] a diffuse burden, ... foreclosing only one of several opportunities.' 'Denial of a future employment opportunity is not as intrusive as loss of an existing job,' and plainly postponement imposes a lesser burden still.") (citations omitted); Stuart v. Roache, 951 F.2d 446, 454 (1st Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992); Higgins v. City of Vallejo, 823 F.2d 351, 360 (9th Cir.1987) ("Like hiring goals, promotion guidelines visit a minor burden on non-minority employees. But unlike hiring goals, promotion guidelines do not require that an individual bear the burden of past discrimination to the extent that he or she is denied a livelihood."), cert. denied, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); accord Long v. City of Saginaw, 911 F.2d 1192, 1196-97 (6th Cir.1990) ("[A]lthough initial employment opportunities coupled with hiring goals may burden some innocent individuals, they do not impose the same type of intrusive injuries that layoffs, which result in loss of job expectancy, security, and seniority, involve.").
 
 
 63
 Furthermore, the promotion of unqualified persons over qualified persons is neither required nor permitted by the plans adopted in Memphis. Thus, to the extent that any Blacks are given "special" treatment, it should be noted that only qualified Blacks are afforded this advantage. This, too, is a significant indication of narrow tailoring. See Mackin v. City of Boston, 969 F.2d 1273, 1278 (1st Cir.1992) (finding that important indicium of narrow tailoring was the plans allowance for special treatment of qualified minorities only), cert. denied, --- U.S. ----, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993).
 
 
 64
 Memphis' plans are also narrowly tailored because they are specifically designed to remedy the existing imbalance between the proportion of Black entry level personnel and Blacks in promotional ranks. Under, the consent decrees the percentage of Blacks promoted approximated the percentage of Blacks in the next rank below to the greatest extent possible using qualified candidates. For example, of the seventy-five promotions made in the police department during the 1988 promotional process, Black candidates were awarded twenty-six positions. This ratio approximated the percentage of Blacks in the next rank below. In 1989, of the ninety-four promotions granted, thirty-three were awarded to Blacks, again approximating their percentage in the relevant applicant pool.
 
 
 65
 The Memphis Fire Department also made limited use of racial classifications to correct the effect of discrimination upon the promotion of minorities. In 1989, Blacks received nine of the forty-one promotions awarded.[1] Though this promotional process applied the 1980 consent decree's target goal of 20%, instead of applying the actual percentage of Blacks in the rank next below, this does not defeat the narrow tailoring of the remedy. See Paradise, 480 U.S. at 179-80, 107 S.Ct. at 1070-71 (approving temporary use of a 50% hiring goal to expedite achievement of long term goal of 25%). From 1989 to 1990, one of the two promotions made to the rank of fire investigator was a minority. Similarly, affirmative action facilitated the promotion of four Blacks to the rank of battalion chief, out of the thirteen total promotions to that position. Much like the promotions in the Police Department, each of the Fire Department's rounds of promotions made limited use of race-conscious affirmative action to remedy only the existing racial imbalance between ranks.
 
 
 66
 Had Memphis not employed affirmative action during these promotional processes, the percentage of Blacks promoted would have remained far below the percentage of Blacks in the next rank below. For example, in 1988, absent the use of race-conscious remedies, Blacks would have received only 9.3% of the promotions, despite the fact that they constituted 32.9% of the applicants, and comprised 32.4% of all patrol officers. Absent the use of affirmative action in the 1989-1990 promotions, neither of the promotions to fire investigator would have gone to minorities, even though 34.8% of the relevant applicant pool was Black. Similarly unacceptable results would have occurred in other areas of promotion absent the race-conscious relief currently under attack.
 
 
 67
 Also of significance, and contrary to the majority's assertion, is the fact that the challenged plans are of limited duration. Memphis can dissolve the decrees at any time, upon the achievement of the stated goals. Yet, the majority argues that the plans are not narrowly tailored because "the City has made no effort to limit the duration of these remedies." Maj. Op. at 1164. Memphis' failure to dispense with the use of affirmative action is hardly an indication of a lack of narrow tailoring. Rather, it demonstrates Memphis' keen appreciation that the current vestiges of prior discrimination have yet to be satisfactorily remedied. As we noted in Jansen v. Cincinnati, 977 F.2d 238, 246 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993), a city is not required to prematurely dismantle its use of affirmative action:
 
 
 68
 While we recognize that a consent decree operating in perpetuity may not be the most effective way to eradicate the evils of discrimination in the municipal workplace, we must remain true to the wording and intent of such decrees, until their goals are met.
 
 
 69
 Consequently, though Memphis had made significant progress toward its goals, it had not yet reached them by 1988 or 1989. The majority ignores binding precedent when it implies that the continued pursuit of the goals of the decree renders the plans unlawful on the grounds that they are not narrowly tailored.
 
 
 70
 The majority also asserts that the plans are not narrowly tailored because "the 1979 and 1980 decrees may not bear a sufficiently precise relationship to the 'relevant labor market.' " Maj. Op. at 1164-65. The majority bases its conclusion on the questionable premise that qualifications for the position of "patrol officer" and "fire private" are in some manner special qualifications that "winnow out a significant portion of the general workforce." Maj. Op. at 1166. The majority's reasoning, however, is in conflict with Supreme Court precedent.
 
 
 71
 In City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501-02, 109 S.Ct. 706, 726, 102 L.Ed.2d 854 (1989), the Court found that "where special qualifications are necessary, the relevant statistical pool ... must be the number of minorities qualified to undertake the particular task." The Court further commented, however, that "[i]n the employment context, we have recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination." Id. at 501, 109 S.Ct. at 726 (emphasis added). The qualifications required of Memphis' entry level police and fire personnel are of the sort described in Croson, which courts have found permit reference to general population statistics. See Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 631-32, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987) ("[A] comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise."); Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977) ("[C]omparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population [is] highly probative [when] the job skill there involved ... is one that many persons possess or can fairly readily acquire."); Davis, 890 F.2d at 1447 (allowing statistical comparison with general population for entry level position of firefighter).[2]
 
 
 72
 For all the reasons stated, we find that the majority erred in concluding that Memphis' challenged plans were not narrowly tailored to meet a compelling state interest. The decrees utilize a benign racial classification to eliminate the present effects of Memphis' prior discrimination in a manner that is both carefully structured and narrowly drafted. We fail to discern any difference between these cases and that of Ohio Contractors Ass'n v. Keip, 713 F.2d 167 (6th Cir.1983) (Lively, J.), in which this court upheld a racially conscious remedy to past discrimination in the awarding of state construction contracts. We note also that Justice O'Conner cited Ohio Contractors Ass'n approvingly in Croson, even though it utilized an intermediate level of scrutiny in finding the Ohio plan to be narrowly tailored. Croson, 488 U.S. at 501, 109 S.Ct. at 725. Croson does not require that we find otherwise here. Accordingly, it was error not to uphold the plans as constitutionally valid.
 
 II.
 
 73
 Having determined that the challenged plans satisfy both prongs of strict scrutiny, we would ordinarily conclude this analysis. However, we wish to address, briefly but with sincere conviction born of stark historical reality, the grave injustice that is perpetrated by the majority's insistence on applying strict scrutiny to the use of remedial racial classifications under the pretext of advancing a color-blind Constitution. Croson, it should be remembered, was a "set-aside" case with a totally different historical context than the affirmative action plans under consideration here. Given the determination of the majority to apply an elevated standard of scrutiny, it might be edifying to revisit the purposes of the Fourteenth Amendment and examine the principle cases which have dealt with employment discrimination remedies.
 
 
 74
 The Fourteenth Amendment was never intended to impose an absolute standard of color blindness upon our law to the extent that such a standard becomes a bar to the achievement of the purposes of the amendment.[3] Rather the amendment sought to ensure that the law would no longer turn a blind eye to the indignities that Black Americans were forced to endure as a result of their race. Thus, adherence to our constitutional mandate requires us to recognize that remedying past discrimination may require the temporary use of benign racial classifications so long as they relate substantially to the important governmental interest of remedying past discrimination.
 
 
 75
 I suspect that it would be impossible to arrange an affirmative-action program in a racially neutral way and have it successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently. We cannot--we dare not--let the Equal Protection Clause perpetuate racial supremacy.
 
 
 76
 Regents of University of California v. Bakke, 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 (1978) (Blackmun, J.). Yet, this is precisely the impact of the majority's opinion. Review of these plans under a strict scrutiny standard routinely results in the invalidation of plans which are designed to achieve the vital goal of remedying our nation's history of discrimination. Such an application is clearly antithetical to the Fourteenth Amendment. In fact, applying strict scrutiny to the benign use of race-conscious affirmative action, which seeks to alter employment patterns shaped by past racial discrimination, comes perilously close to nullifying the amendment as it pertains to persons of color.
 
 
 77
 A plurality of the Supreme Court first urged the use of the intermediate scrutiny standard of review when evaluating challenges to remedial racial classifications in Bakke.[4] Of the five justices in Bakke who addressed the standard of review question, four justices expressly rejected the notion that strict scrutiny was the proper standard to be applied. See 438 U.S. at 356-62, 98 S.Ct. at 2781-85 (Opinion of Brennan, White, Marshall, & Blackmun, JJ.). Writing in the context of their Fourteenth Amendment inquiry, Justices Brennan, White, Marshall, and Blackmun found that
 
 
 78
 claims that law must be "color-blind" or that the datum of race is no longer relevant to public policy must be seen as aspiration rather than as description of reality. This is not to denigrate aspiration; for reality rebukes us that race has too often been used by those who would stigmatize and oppress minorities. Yet we cannot--and, as we shall demonstrate, need not under our Constitution ...--let color blindness become myopia which masks the reality that many "created equal" have been treated within our lifetimes as inferior both by the law and by their fellow citizens.
 
 
 79
 Id. at 327, 98 S.Ct. at 2767 (emphasis added). Thus, acknowledging this history--which is beyond challenge--and recognizing that applying a more stringent standard of review would result in the unwarranted dismantling of myriad affirmative action programs, the Bakke plurality concluded "that racial classifications designed to further remedial purposes 'must serve important governmental objectives and must be substantially related to achievement of those objectives.' " Id. at 359, 98 S.Ct. at 2783 (citing Califano v. Webster, 430 U.S. 313, 317, 97 S.Ct. 1192, 1194, 51 L.Ed.2d 360 (1977) (quoting Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976))).
 
 
 80
 After Bakke, the Supreme Court, with solid historical justification, used intermediate scrutiny to determine the lawfulness of other affirmative action plans. In United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), a majority of the Court determined that a modified standard of review should be applied to race-based affirmative action plans challenged as violative of Title VII. The Weber Court adopted the Bakke plurality's position that traditional racial classifications are distinct from benign racial classifications and thus warrant a modified form of inquiry. The Weber Court further recognized that the use of remedial racial classifications was not adverse to the spirit or intention of Title VII. Id. at 201-04, 99 S.Ct. at 2726-28. Accordingly, the Court found that, when considering the legality of challenged affirmative action programs, Title VII's "prohibition against racial discrimination ... must ... be read against the background of the legislative history of Title VII and the historical context from which the Act arose." Weber, 443 U.S. at 201, 99 S.Ct. at 2726. The majority has not--and cannot--offer any justification for treating the Fourteenth Amendment with less consideration than Title VII.
 
 
 81
 Since Bakke and Weber, the virtues of the intermediate scrutiny standard in the context of benign racial classifications have been noted repeatedly. See also Fullilove v. Klutznick, 448 U.S. 448, 517-19, 100 S.Ct. 2758, 2794-96, 65 L.Ed.2d 902 (1980) (Marshall, J., joined by Brennan & Blackmun, JJ.) ("Because the consideration of race is relevant to remedying the continuing effects of past racial discrimination, and because governmental programs employing racial classifications for remedial purposes can be crafted to avoid stigmatization, we conclude[ ] that such programs should not be subjected to conventional 'strict scrutiny'--scrutiny that is strict in theory, but fatal in fact."); Wygant, 476 U.S. at 301-02, 106 S.Ct. at 1861-62 (Marshall, J., joined by Brennan & Blackmun, JJ.); Johnson, 480 U.S. at 626-27, 107 S.Ct. at 1448-49 (holding that "assessment of the legality of the Agency Plan must be guided by our decision in Weber "); Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 515-16, 106 S.Ct. 3063, 3071-72, 92 L.Ed.2d 405 (1986) (affirming Weber Court's holding that "Title VII permits employers and unions voluntarily to make use of reasonable race-conscious affirmative action"); Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 564-65, 110 S.Ct. 2997, 3008-09, 111 L.Ed.2d 445 (1990) (holding that "benign race-conscious measures mandated by Congress ... are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives").
 
 
 82
 Before today, this circuit, too, acknowledged the need for application of intermediate scrutiny in reverse discrimination cases. See Detroit Police Officers' Ass'n v. Young, 608 F.2d 671 (6th Cir.1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). In Detroit Police Officers' Ass'n, this court was asked to consider the validity of an affirmative action program implemented by the Detroit Police Department. In reversing the district court's determination that the plan was not supportable, we concluded the following:
 
 
 83
 Bakke and Weber make it clear that a case involving a claim of discrimination against members of the white majority is not a simple mirror image of a case involving claims of discrimination against minorities. One analysis is required when those for whose benefit the Constitution was amended or a statute enacted claim discrimination. A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a group formerly subjected to discrimination the case moves with the grain of the Constitution and national policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain, and the official actions complained of must be subjected to the analysis prescribed in Weber and the plurality opinion in Bakke which we find controlling.
 
 
 84
 608 F.2d at 697. The force of the justification for adopting this intermediate standard, so logically stated by Judge Lively in Detroit Police Officers' Ass'n, cannot be ignored. Yet, the majority, today, retreats from these settled remedial principles.
 
 
 85
 Judicial contempt for racial classifications did not arise in a historical vacuum. Rather, the law belatedly acknowledged the centuries of racial discrimination that had been imposed upon minorities simply because of the color of their skin. Thus, as the plurality in Bakke noted, racial classifications are objectionable not due to some abstract notion of color-blind justice, but because of the astute recognition that most such classifications stigmatize people on the basis of their skin color. Bakke, 438 U.S. at 361-62, 98 S.Ct. at 2784-85. Benign racial classifications, however, do not result in stigmatization. Quite to the contrary, benign racial classifications further the very constitutional principle--equality--that makes most other racial classifications odious in the first place. Consequently, the "principles outlawing the irrelevant or pernicious use of race [are] inapposite to racial classifications that provide benefits to minorities for the purpose of remedying the present effects of past racial discrimination." Fullilove, 448 U.S. at 518, 100 S.Ct. at 2795. Affirmative action programs, which seek to remedy prior discrimination, promote the true goals of constitutional equality. Thus, a presumption of diminished skepticism should attach to these racial classifications, justifying application of a less stringent standard of review.
 
 
 86
 Justice Marshall succinctly, and perhaps more compellingly, argued in favor of application of the intermediate standard of review to benign racial classifications in his dissent in Croson, 488 U.S. at 528-61, 109 S.Ct. at 740-57 (Marshall, J., joined by Brennan & Blackmun, JJ.). Justice Marshall observed that application of a strict scrutiny analysis will too often result in the unwarranted dismantling of remedial affirmative action plans intended to confront our nation's long history of racial discrimination. Id. at 552-53, 109 S.Ct. at 752-53. As a practical matter, the strict scrutiny standard is always likely to be fatal to race-based affirmative action plans. See Michael Rosenfeld, Decoding Richmond: Affirmative Action and the Elusive Meaning of Constitutional Equality, 87 MICH.L.REV. 1729, 1758 (1989). Once one acknowledges this undeniable consequence, the needless application of a strict scrutiny analysis to affirmative action plans cannot be justified, for to do so conflicts directly with the purpose and historical function of the Fourteenth Amendment--the very amendment by which such scrutiny is ostensibly commanded.
 
 As Justice Marshall noted:
 
 87
 [I]t is inconceivable that the Fourteenth Amendment was intended to prohibit all race-conscious relief measures. It "would be a distortion of the policy manifested in that amendment, which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color," Railway Mail Ass'n v. Corsi, 326 U.S. 88, 94 [65 S.Ct. 1483, 1487, 89 L.Ed. 2072] (1945), to hold that it barred state action to remedy the effects of that discrimination. Such a result would pervert the intent of the Framers by substituting abstract equality for the genuine equality the Amendment was intended to achieve.
 
 
 88
 Bakke, 438 U.S. at 398, 98 S.Ct. at 2803 (Marshall, J.). Accordingly, to the extent that we concede the undeniable history of racial discrimination in America, and to the extent that we acknowledge the Framers' desire to redress this history through the Fourteenth Amendment's guarantees, we should decline to adopt a standard of review that effectively destroys any chance this nation has of realizing the Amendment's true aspirations. Moreover, members of the majority conceded during argument, and subsequently, that remedying discrimination in the Memphis Police and Fire Departments is justified by a compelling state interest.
 
 
 89
 Because the central purpose of the Fourteenth Amendment was to remedy the effects of past discrimination against Black Americans, and because, as a practical matter, application of the strict standard of review prohibits the use of benign racial classifications intended to achieve this goal, we conclude that intermediate scrutiny is the only legally defensible standard to be applied in a case such as this.
 
 III.
 
 90
 Though under Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), it is the province of the Court to interpret laws and the Constitution, the majority would be wise to heed the sentiments of the American people as expressed through their elected representatives. The Civil Rights Act of 1991 (the "1991 Act") prohibits certain challenges to employment practices under the Constitution and federal law when those practices are pursuant to consent decrees. See 42 U.S.C. Secs. 2000e-2(n)(1)(A)-(B)(ii) (Supp. IV 1992). Section 108 of the 1991 Act was a specific Congressional response to Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (holding that a party can not be deprived of rights at a proceeding to which he is not a party), as well as City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Section 108 explicitly bars judicial assaults upon consent decrees by persons whose interests have been previously considered by the court. The statute states in relevant part:
 
 
 91
 (n) Resolutions to challenges to employment practices implementing litigated or consent judgments or orders
 
 
 92
 (1)(A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).
 
 
 93
 (B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--
 
 
 94
 (i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--
 
 
 95
 (I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgement or order by a future date certain; and
 
 
 96
 (II) a reasonable opportunity to present objections to such judgment or order; or
 
 
 97
 (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.
 
 
 98
 42 U.S.C. Secs. 2000e-2(n)(1)(A)-(B)(ii) (Supp. IV 1992) (emphasis added).
 
 
 99
 In the instant case, prior to entry of the consent decree governing the Fire Department's hiring and promotional practices, notice was given, and a hearing was held on May 16, 1980, to allow individuals to voice objections to the entry of the decree. See Appellees Br. on Rehearing En Banc (Eason ) at 8. Similarly, prior to the adoption of the consent decrees governing the Police Department, non-minorities were given an opportunity to express any objections to its entry. See Appellee's Br. on Rehearing En Banc (Aiken ) at 7. Consequently, if applied to this case, section 108 would foreclose the current attack on Memphis' adoption of race-conscious remedies to effect the goals of those decrees.
 
 
 100
 This court has declined to apply the 1991 Act retroactively to conduct which occurred before the Act became law and which is made unlawful by the Act itself. See Holt v. Michigan Dept. of Corrections, 974 F.2d 771 (6th Cir.1992) (finding that state employee could not sue state for alleged discrimination in its selection of employees for promotion to higher-level positions under 1991 Act because alleged discrimination had occurred before Act became law); Vogel v. City of Cincinnati, 959 F.2d 594 (6th Cir.1992) (holding that 1991 Act did not apply retroactively to plaintiff's claim for damages resulting from hiring policy adopted pursuant to 1981 consent decree) cert. denied, --- U.S. ----, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992); Harvis v. Roadway Express, Inc., 973 F.2d 490 (6th Cir.1992) (holding that 1991 Act could not be applied retroactively to race discrimination in firing claims because suits were pending at time 1991 Act was enacted), aff'd sub nom. Rivers v. Roadway Express, Inc., --- U.S. ----, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).
 
 
 101
 More recently, the Supreme Court has held two provisions of the 1991 Act not to apply to proceedings pending on the November 11, 1991, the date of enactment. In Landgraf v. U.S.I. Film Prods., --- U.S. ----, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Court held that section 102 of the 1991 Act, 42 U.S.C. Sec. 1981a (Supp. IV 1992), which includes provisions that create a right to recover compensatory and punitive damages for intentional discrimination violative of Title VII, would not apply retroactively to pending cases. Similarly, in Rivers v. Roadway Express, Inc., --- U.S. ----, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), the Court upheld this circuit's Harvis holding by finding that section 101 of the Act, 42 U.S.C. Sec. 1981(b) (Supp. IV 1992), which defines 42 U.S.C Sec. 1981's "make and enforce contracts" phrase to embrace all phases and incidents of a contractual relationship, including discriminatory contract terminations, does not apply to cases which arose before it was enacted. In declining to apply the 1991 Act retroactively, this circuit reasoned that " 'the law should confine its prohibitions and regulations to future conduct, so that the persons subject to the law can conform their conduct to it and thus avoid being punished, whether criminally or civilly, for conduct that they had no reason to think unlawful.' " Holt, 974 F.2d at 774 (quoting Luddington v. Indiana Bell Tel. Co., 966 F.2d 225, 227-28 (7th Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 1641, 128 L.Ed.2d 362 (1994)). The Supreme Court has expressed a similar concern in its decisions. See generally Landgraf, --- U.S. at ---- - ----, 114 S.Ct. at 1497-1501.
 
 
 102
 The present case is, however, qualitatively different from the aforementioned cases. Here, Memphis seeks to use the 1991 Act as a shield rather than as a sword, as was the case in Holt, Vogel, Harvis, Landgraf, and Rivers. Fairness generally requires that "individuals should have an opportunity to know what the law is and to conform their conduct accordingly." Landgraf, --- U.S. at ----, 114 S.Ct. at 1497. Yet, this general rule neither requires nor implies that newly enacted legislation which is not punitive in character, cannot be applied retroactively. Although neither the Supreme Court nor this circuit has allowed the punitive provisions of the 1991 Act to be applied retroactively, we have not specifically determined whether section 108, a provision protective of remedial consent decrees, is appropriately applied to cases arising before the date of enactment. Any contrary inference from our previous holdings is premature.
 
 
 103
 Moreover, in determining the applicability of the 1991 Act to a longstanding policy of racial consideration in promotions, such as the one at issue today, we find little guidance in this circuit's use of such an amorphous test as whether the "conduct occurred prior to the Act." Holt, 974 F.2d at 773-74 (emphasis added). When an individual alleges discrimination in promotions outside of the remedial policy context, as was claimed by the Black employee in Holt, the court can easily isolate the precise time that the alleged discriminatory "conduct" took place--i.e., the time when the aggrieved individual was passed over for a promotion. This determination is not so readily made when evaluating a challenge to a longstanding remedial policy. Arguments could reasonably be made that the "conduct" occurred when the consent decree was entered into or when appellants were passed over for promotion. However, an argument could also reasonably be made that the "conduct" occurred at all times from the effective date of the consent decree until today.
 
 
 104
 This circuit has yet to specifically address either of these important issues. Given the historic and practical necessity for the use of consent decrees and benign racial classifications to remedy past racial discrimination, we are inclined to believe that section 108 is appropriately applied retroactively to challenges such as this.[5] However, we recognize that this court can only make such a determination after the issue has been raised and we have been appropriately briefed. Cf. Vogel, 959 F.2d at 601 (Ryan, J., concurring in part and dissenting in part).
 
 IV.
 As one academic recently noted:
 
 105
 Although affirmative action treats whites unequally to blacks, it need not deprive them of any legitimate equal opportunity rights. Viewed from the proper contextual perspective, the only thing that affirmative action seems to take away from the "innocent" white person is the increased prospects of success gained as a consequence of the racially discriminatory acts (or omissions) of the state. The reduction in the prospects of blacks attributable to official racial discrimination has already produced a windfall in the form of increased prospects of success for all the other competitors seeking to obtain scarce public goods. In this sense, affirmative action merely restores the equal-opportunity balance, placing both blacks and whites in the position in which formal means-regarding equality of opportunity would have left them absent official racial discrimination.... Even if completely innocently acquired, the increased prospects of success gained through the unjust treatment of blacks are entirely undeserved. Thus, although the loss of these increased prospects may result in bitter disappointment, it does not amount to a violation of any equal opportunity right.
 
 
 106
 Rosenfeld, supra, at 1790. Bearing this in mind, I would be remiss if I failed to respond to the benighted concerns raised in the separate concurrence.
 
 
 107
 The concurrence, part two, argues that there is a substantially greater risk that the challenged remedial plans will be abused because Memphis is now predominantly Black. This fact alone led into a non sequitur by concluding that the City's current demographics require that the plans be painstakingly scrutinized to "ensure that the decree is not being used to prefer the majority race in the city, whether black or white." Concurrence, at 1168-69. This point ignores the record against which the tailored remedy of the consent decree must be measured. That record clearly shows the existence of vestiges of racial exclusion that the parties, by entering into the consent decree, sought to eradicate. A change in the political/racial makeup of Memphis is irrelevant with respect to that reality. The reversal here threatens to freeze into place the vestiges of those racial policies. A cursory examination of the historic interplay of race and power in our nation reveals the expressed fear of "majority" preference to be unwarranted at best. See Keith, J., dissenting, at 1180.
 
 
 108
 The simple reversal of the races to determine the propriety of racial classifications is not useful in evaluating the validity of the plans before this court, for it decontextualizes a debate that has little actual relevance outside of the context of the history or politics from which it arose. Because
 
 
 109
 the differences between blacks and whites relevant for purposes of assessing the legitimacy of unequal treatment are more than a mere matter of skin pigmentation ... the reversal test is superficial and misleading. To be meaningful, the reversal test must take these differences into account, entailing more than its simple hypothetical color switch, but also a switch in economic, political, and historical conditions, and a switch in attitudes, beliefs, and psychological makeups.
 
 
 110
 Rosenfeld, supra, at 1776. Consequently, because the current racial traits of each of these considerations have not also been altered, there is little reason to believe that Memphis' limited use of benign racial classifications will result in a system of reverse discrimination.
 
 V.
 
 111
 We write at considerable length, because today the majority invalidates Memphis's laudable attempt at racial healing and eradication of the present day effects of racial discrimination. In so holding, the majority takes yet another premature step toward the illusory concept of a color-blind Constitution. This represents a repudiation of the good faith that attended the unifying purpose of the consent decree. The undeniable fact is that this nation has yet to fully confront its racist history. Until this preliminary hurdle is surmounted, the rejection of race-conscious remedies, under the guise of promoting color-blind justice, simply maintains a status quo premised upon the subordination of minorities.
 
 
 112
 In Bakke, Justice Marshall cautioned that, given "the sorry history of discrimination and its devastating impact on the lives of Negroes, bringing the Negro into the mainstream of American life should be a state interest of the highest order. To fail to do so is to ensure that America will forever remain a divided society." Bakke, 438 U.S. at 396, 98 S.Ct. at 2802 (Marshall, J.). Significant gains have been made since Justice Marshall wrote these words. Nevertheless, failure to observe the continuing viability of his message is improvident. As former Chief Justice Burger wrote:
 
 
 113
 All things being equal, with no history of discrimination, it might well be desirable to [engage in solely race-neutral employment policies]. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial [discrimination]. The remedy for such [discrimination] may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all the awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate [our racially-sullied past.]
 
 
 114
 Swann, 402 U.S. at 28, 91 S.Ct. at 1282 (emphasis added).
 
 
 115
 We will never get beyond the issue of race until we squarely recognize its harmful presence. Justice Blackmun recognized that suspicion of racial classifications cannot justify our collective failure to move toward racial equality.
 
 
 116
 I, of course, accept the proposition that (a) Fourteenth Amendment rights are personal; (b) racial and ethnic distinctions where they are stereotypes are inherently suspect and call for exacting judicial scrutiny; ... and (d) the Fourteenth Amendment has expanded beyond its original 1868 concept and now is recognized to have reached a point where ... it embraces a "broader principle."
 
 
 117
 This enlargement does not mean for me, however, that the Fourteenth Amendment has broken away from its moorings and its original intended purposes. Those original aims persist. And that, in a distinct sense, is what "affirmative action," in the face of proper facts, is all about. If this conflicts with idealistic equality, that tension is original Fourteenth Amendment tension, constitutionally conceived and constitutionally imposed, and it is part of the Amendment's very nature until complete equality is achieved....
 
 
 118
 Bakke, 438 U.S. at 404-05, 98 S.Ct. at 2806 (Blackmun, J.).
 
 
 119
 Notwithstanding the undeniable force of this observation, the majority today opts to sidestep the lingering and indisputable vestiges of past discrimination by reversing one city's commendable effort at healing, as it struggles to come to terms with the sins of its past. I concede that for many persons dealing with racial injustice and remedies is painful. The easier course is to marginalize the issue or pretend that color blindness forbids us from directly confronting the problem. This ill serves our nation, and is in contravention of sound remedial principles and precedent. We DISSENT.
 
 
 120
 KEITH, Circuit Judge, dissenting.
 
 
 121
 I join Judge Jones's excellent dissent and I would affirm the district court's decision as stated in the original panel decision. I also emphatically disagree with the standard applied by the en banc court to the affirmative action programs in these cases. I write separately, however, to address the unfortunate inaccuracies and misconceptions articulated within Chief Judge Merritt's separate concurrence.
 
 
 122
 First, I must stress my displeasure and dismay with the use of a judicial opinion to politicize this legal debate. The concurrence cites no law but instead represents one Judge's personal viewpoint. It focuses on topics irrelevant to the case before us in order to present an ahistorical view of affirmative action programs. Thankfully, this writing represents neither this Circuit's nor the Supreme Court's perspective and is of no relevance to the district court on remand.
 
 
 123
 Here, the Appellants did not challenge the undisputed past discrimination against African-Americans in the City of Memphis. Additionally, the City's interest in remedying past discrimination is a compelling one. Regardless of one's ideological perspective on affirmative action, the question before the en banc court was a legal one--whether the City's remedy was narrowly tailored.
 
 
 124
 In this effort to denigrate affirmative action, a false picture is painted of a majority black city wielding its newly found power to wrongly deprive the white citizens of Shelby County. It states that the general and voting populations of the City of Memphis are now predominantly Black as are the Mayor and many high ranking administrative aids. "Accordingly, there is a substantially greater risk that the continued use of racial hiring goals which exceed the qualified labor pool in question may discriminate against whites.... We may not assume in such a situation that the required employment ratio is benign." This statement summons and manipulates the fears of affirmative action that have been nurtured by American society. There is no support for the assumption that Blacks in positions of power will discriminate against whites as their white predecessors discriminated against Blacks. It saddens me deeply to read this political button-pushing in what should be a legal opinion.
 
 
 125
 More importantly, the concurrence mischaracterizes the purpose of the remedial plan proposed by the City of Memphis. According to the concurrence, the purpose of the consent decree, and of the Equal Protection Clause, is to protect a "minority" race within a city from the majority race "which controls the governmental machinery." Playing fast and loose with the term "minority," the concurrence ignores one undisputed fact--the compelling interest behind and purpose of consent decrees are to remedy past discrimination against African-Americans. Absolutely no evidence was presented concerning a history of discrimination against white males by the City of Memphis.
 
 
 126
 Although the population of Memphis has become "majority" African-American within the past ten years, this fact--largely a result, I assume, of white flight--does not erase the past discrimination within the City and within the fire and police departments. The consent decree was enacted to remedy this past discrimination in an attempt to put African-American officers on a realistic promotional track. Where departments historically refused to hire African-Americans until forced by court order, and where promotional requirements included a seniority factor, no realistic hiring or promotional opportunities for African-Americans exist without this remedy.
 
 
 127
 The assertion that "[t]he Equal Protection Clause does not allow the majority race in a city to use its governmental power to prefer its race over the minority race" astounds me. This statement ignores that our legislators promulgated the Fourteenth Amendment to eradicate this Country's long history of subjugating African-Americans. Further, the Fourteenth Amendment was not intended to prohibit measures designed to remedy this Country's treatment of African-Americans.
 
 
 128
 The fact that a minority race--I assume all will concede that African-Americans are still a minority race in America--assumes a numerical "majority" within a city's limits changes nothing. The history of the discrimination against African-Americans and denials of opportunities to African-Americans within the City of Memphis ensures the "minority" white race will never be at a disadvantage there. Certainly the "minority" white population will never experience the legally segregated and underfunded education of their children, the denial of access to housing in "majority" neighborhoods, the indignity of having to use the "minority" only water fountain at a department store or the double indignity of "minority" employees having to use the back door of the Peabody Hotel in order to serve "majority" patrons.
 
 
 129
 My deepest regret about the assertions in the concurrence is the proposition that legalized racial discrimination could ever be reinstituted in reverse in this Country. For African-Americans, America has a long tradition of slavery, segregation, bigotry, and injustice. In the not-so-distant past, a past many would like to forget, American society legalized the inferior treatment of an entire race of people based solely on the color of their skin. This legalization of bigotry denied African-Americans access to, and participation in, all the opportunities, all the benefits, all the rewards, and all the powers embodied by the American ideals of liberty and democracy.
 
 
 130
 All the affirmative action programs we could possibly dream up can not change the color of one's skin. This fact renders the likelihood of legalized racial discrimination against a white "minority" preposterous. The appearance of this proposition in legal discourse, especially considering the history of Memphis, is insulting and saddening.
 
 
 131
 Justice Marshall eloquently described the denial of the American dream to African-Americans in Bakke, stating that:
 
 
 132
 [T]he racism of our society has been so pervasive that none regardless of wealth or position, has managed to escape its impact.... The experience of Negroes in America ... is not merely the history of slavery alone, but also that a whole people were marked as inferior by the law. And that mark has endured. The dream of America as the great melting pot has not been realized for the Negro; because of his skin color he never even made it into the pot.
 
 
 133
 University of California Regents v. Bakke, 438 U.S. 265, 400-01, 98 S.Ct. 2733, 2804, 57 L.Ed.2d 750 (1978). Symbolic of this truth articulated by Justice Marshall is the experience of tennis player Arthur Ashe who, in 1993, died of AIDS. Ashe wrote in Days of Grace that "living with AIDS is not the greatest burden I've had in my life. Being black is. No question about it. Even now it continues to feel like an extra weight tied around me." Arthur Ashe, Days of Grace, (1993). No matter how numerous the triumphs achieved or how grave the obstacles encountered, being Black in American society continues to overpower the successes and failures of African-Americans in a way a white "minority" could never experience.
 
 
 134
 Those who see a population majority in Memphis as a threat to the empowered racial majority distort reality. This view intersects with the oft recited litany that African-Americans should forget the past and pull themselves up by their bootstraps. These notions fail to appreciate the nature of the obstacles which continue to impede equal access to opportunity. Even today, even within cities where African-Americans tip the population scales at 51%, the systemic discrimination against African-Americans in America is firmly rooted in our institutions and was at one time the official policy of our governments. Quite simply, there have been no bootstraps to pull on--and none exist today.
 
 
 135
 I can not accept that African-Americans, until recently, practiced self-exclusion in Memphis. Nor can I accept the notion that a tyrannic African-American "majority" is now stealing all the opportunities from a white "minority." Similarly, common sense dictates that the proposition that a consent decree seeking to remedy past discrimination could ever, in reality, place whites at a disadvantage in hiring or promotion is ludicrous. The consent decrees were designed to level a historically uneven playing field. Some preference may be necessary to reach this laudable end.
 
 
 136
 Finally, I close with the often quoted, yet ever evocative words of Justice Harry Blackmun:
 
 
 137
 I suspect that it would be impossible to arrange an affirmative-action program in a racially neutral way and have it successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently. We cannot--we dare not--let the Equal Protection Clause perpetuate racial supremacy.
 
 
 138
 Bakke, 438 U.S. at 407, 98 S.Ct. at 2807. These words ring true and should be instructive. In 1994, equality is far from won. In fact, today we are faced with a new oxymoron--the notion of reverse racial discrimination. This outrageous notion is nothing but inflammatory fodder designed to discourage taking race into account even where such accounting promotes fundamental fairness, equality, and justice.
 
 
 
 [1]
 The Aiken litigation began as two separate lawsuits but was consolidated into one case on appeal
 
 
 [2]
 The Eason litigation began as two separate lawsuits but was consolidated into one case on appeal
 
 
 [3]
 We emphasize that our holding is limited to the issue of whether the promotions at issue here were supported by a compelling interest. We express no opinion as to whether race-based promotions made after the decrees' goals have been met likewise would be supported by a compelling interest. See generally Detroit Police Officers Ass'n v. Young, 989 F.2d 225, 228 (6th Cir.1993)
 
 
 [4]
 Unlike the 1974 decree, which is quoted in the text, the 1981 decree states that its hiring goals shall be determined by reference to the "relevant Shelby County civilian labor force." (Eason App. at 79) (emphasis added). Nevertheless, the City has indicated that it continues to use undifferentiated Shelby County civilian labor force statistics to set its hiring goals. See Response of Eason Defendants to Petition for Rehearing En Banc at 4 ("Affirmative action was thus utilized pursuant to the consent decrees in the promotional processes challenged herein as the minority representation in each rank was still considerably below the 35.1% non-white level in the Shelby County civilian labor market."); Response of Aiken Defendants to Petition for Rehearing En Banc at 4 ("[M]inority representation in the sergeant rank increased to 22% in 1988 and to 25.6% in 1989. However, minority representation in the sergeant rank was still significantly below the 35.1% minority representation in the civilian labor market for Shelby County, Tennessee.") (Citation omitted)
 
 
 [5]
 Section 38-8-106 provides:
 38-8-106. Qualifications of police officers.--(a) After July 1, 1981, any person employed as a full-time police officer, and after January 1, 1989, any person employed/utilized as a part-time/temporary/reserve/auxiliary police officer or as a special deputy shall:
 (1) Be at least eighteen (18) years of age;
 (2) Be a citizen of the United States;
 (3) Be a high school graduate or possess equivalency;
 (4) Not have been convicted of or pleaded guilty to or entered a plea of nolo contendere to any felony charge or to any violation of any federal or state laws or city ordinances relating to force, violence, theft, dishonesty, gambling, liquor or controlled substances;
 (5) Not have been released or discharged under any other than honorable discharge from any of the armed forces of the United States;
 (6) Have such person's fingerprints on file with the Tennessee bureau of investigation;
 (7) Have passed a physical examination by a licensed physician;
 (8) Have a good moral character as determined by a thorough investigation conducted by the employing agency; and
 (9) Be free of all apparent mental disorders as described in the Diagnostic and Statistical Manual of Mental Disorders, Third Edition (DSM-III) of the American Psychiatric Association. Applicants must be certified as meeting these criteria by a qualified professional in the psychiatric or psychological fields.
 
 
 [6]
 This regulation provides that a firefighter shall:
 (a) be at least eighteen (18) years of age; and
 (b) be a citizen of the United States; and
 (c) be a high school graduate or possesses equivalency; and
 (d) have not been convicted of any felony charge, have not pleaded guilty to any felony charge, have not entered a plea of nolo contendere to any felony charge; and
 (e) have not have been released or discharged under any other than honorable discharge from any of the armed forces of the United States; and
 (f) have no history, within the past three (3) years, of habitual intoxication and/or personal misuse of any drugs, and/or the use of intoxicating liquors, narcotics, controlled substances and/or stimulants in such a manner as to adversely affect the person's ability to perform as a fire fighter [or] to cause discredit to the fire service; and
 (g) must [sic] meet all local requirements; and
 (h) have passed a physical examination by a licensed physician; and
 (i) have a good moral character[;]
 (j) or have successfully appealed such cause of ineligibility to the appropriate local authority having jurisdiction.
 
 
 [7]
 This conclusion merely makes explicit what was implicit in our holding in Long v. City of Saginaw, 911 F.2d 1192 (6th Cir.1990), where we held that undifferentiated workforce statistics cannot be used to fashion a narrowly tailored affirmative action remedy for past discrimination in police department hiring and promotions. Id. at 1200. See also Janowiak v. Corporate City of South Bend, 836 F.2d 1034, 1041-42 (7th Cir.1987) (reliance upon general workforce statistics was improper basis for fashioning a narrowly tailored remedy for past discrimination in police and fire departments), cert. denied 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). But see Davis v. City and County of San Francisco, 890 F.2d 1438, 1447 (9th Cir.1989) (use of general workforce statistics permissible to show discrimination in fire department), cert. denied sub nom. San Francisco Fire Fighters Local 798 v. San Francisco, 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 206 (1990)
 
 
 [8]
 The Dothard Court also noted, but did not rely on, the fact that women composed 36.89% of the Alabama labor force but held only 12.9% of Alabama's prison guard positions. 433 U.S. at 329, 97 S.Ct. at 2726
 
 
 [9]
 It appears that the City has used the most current statistics available in setting its hiring goals. (See Aiken App. at 183-84.) Since there never has been any analysis of the racial makeup of the qualified labor pool, the possibility remains that the proportion of blacks in the qualified labor pool at the time of the promotions at issue here was greater than the proportion of blacks in the qualified labor pool during the period for which there is "strong evidence" of discrimination. Because the issue was neither raised nor briefed on appeal, however, we express no opinion at this time as to whether a hiring goal that mandates levels of black representation greater than the level of black representation in the qualified labor pool during the period in which discrimination occurred can be a narrowly tailored remedy for that discrimination
 
 
 [10]
 Although the district court held that plaintiffs lacked standing to argue that the decrees have not been applied as written, the court did not hold that plaintiffs lacked standing to argue that the decrees have been applied in a manner that violates their constitutional rights
 
 
 [11]
 Since much of Judge Jones's dissent concerns issues such as the applicability of the Civil Rights Act of 1991 that were never raised nor argued, the majority opinion does not address these issues nor respond to Judge Jones's contentions relative to these issues. One response to the dissent is appropriate, however. The observation that the majority has concluded that strict scrutiny is the appropriate analysis for the remedy provisions of the decrees is, of course, an accurate one. The explicit and implicit contention that the majority has made a finding that the remedy provisions are not narrowly tailored is incorrect. A finding on this issue first will have to be made in the district court upon remand
 
 
 [1]
 In 1988-89, the Fire Department commenced a promotion process for the rank of fire lieutenant. The department's fire privates and fire drivers, the relevant applicant pool from which fire lieutenants were drawn, was only 15.3% Black. Because this percentage was below the target percentage identified in the 1980 consent decree, the City used the 20% goal established in the decree
 
 
 [2]
 The majority hints that the requirement that an applicant be a non-felon constitutes a "special qualification" which renders reference to general population statistics inappropriate. However, with fewer than 500 of every 100,000 Americans in jail, see Dan Cordtz, Getting Tough On Violent Crime, FINANCIAL WORLD, March 15, 1994, at 22, the majority's assertion that this qualification excludes significant portions of the population to be unsubstantial and unpersuasive at best
 
 
 [3]
 First espoused in Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting), the concept that our Constitution must be color-blind was not adopted by a majority of the Court. See also Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 19, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971) (rejecting contention that Constitution requires color-blindness). Had Justice Harlan's view been adopted and prevailed during the 58 years of Plessy, the situation today would permit the result urged by the majority
 
 
 [4]
 Justice Powell, writing for the majority, concluded that the judgment of the California Supreme Court should be affirmed insofar as it held Bakke should be admitted to the University's Medical School. Powell, however, stood alone in his conclusion that strict scrutiny was the appropriate standard to be applied to affirmative action programs. The four justices in Bakke, who with Powell comprised a majority with respect to the actual result, avoided reaching the constitutional issue by deciding instead that the University's affirmative action program was violative of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000d et seq. See Bakke, 438 U.S. at 411-12, 98 S.Ct. at 2809-10 (Stevens, J.) (finding that Court should avoid "constitutional issue if a case can be fairly decided on a statutory ground.")
 
 
 [5]
 In addition to section 108 discussed above, Congress made clear its intent to protect consent decrees in section 116 of the 1991 Act. Section 116 reads as follows:
 LAWFUL COURT ORDERED REMEDIES, AFFIRMATIVE ACTION, AND CONCILIATION AGREEMENTS NOT EFFECTED.
 Nothing in the amendments made by this title shall be construed to affect court ordered remedies, affirmative action plans, or conciliation agreements that are in accordance with the law.
 42 U.S.C. Sec. 1981 note (Supp. IV 1992).
 Section 116 has been referred to as a "savings clause." See Reginald C. Govan, Honorable Compromises and the Moral High Ground: The Conflict Between the Rhetoric and the Content of the Civil Rights Act of 1991, 46 RUTGERS L.REV. 1, 241 (1993). Its language makes clear Congress' intent that the 1991 Act not be used as a mechanism to dismantle remedial programs. While remedial programs may be attacked on other legal grounds, I think it prudent, in all cases, to remain mindful of the quagmire that we create when we use laws which are intended to remedy past racial discrimination against the very people who have historically been made to bear the burden of legal and extra-legal racial discrimination.